KINNARI A.,

                Plaintiff,

     v.

ANDREW M. SAUL,
Commissioner of Social Security,

                Defendant.

Case No. 19 C 760

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Kinnari A. seeks judicial review of the final decision of the Commissioner of Social Security finding her ineligible for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Kinnari's motion [14] is denied, the Commissioner's motion [20] is granted, and the ALJ's decision is affirmed.

## BACKGROUND

In October 2015, Kinnari filed her application for disability insurance benefits, claiming she became unable to work at age 34 because of a back injury, bilateral tennis elbow, bilateral carpal tunnel syndrome, chest pain, arthritis, neck pain, chronic headaches, and chronic fatigue. Kinnari has three herniated discs, which are the result of a 2007 car accident in which she was rear-ended. She attributes her chronic back pain to the car accident. Kinnari reported seeing a pain management specialist for her back pain and being treated with steroid injections in 2008. Kinnari further reported being diagnosed with bilateral carpal tunnel syndrome in 2006 and having release surgery on both hands in 2007.

Kinnari was also diagnosed with tennis elbow, which she has treated with physical therapy and a steroid injection to her left elbow. Kinnari graduated from high school and attended one year of college. She has previous work experience as a database administrator, cashier, and a home-based sales representative and last worked on January 1, 2014. After Kinnari's application was denied initially and upon reconsideration, an administrative law judge ("ALJ") held a hearing. Kinnari, represented by counsel, testified, as did a vocational expert ("VE").

On March 20, 2018, the ALJ issued a decision denying Kinnari's DIB claim. (R. 13-29). At the outset, the ALJ determined that Kinnari was last insured as of December 31, 2018. *Id.* at 14.[1] Following the five-step sequential analysis, the ALJ found that Kinnari had not engaged in substantial gainful activity (step 1) and that she suffered from the severe impairments of degenerative disc disease, bilateral ulnar neuropathy, fibromyalgia, migraine headaches, osteoarthritis of the left knee, affective disorders, and anxiety disorders. *Id.* at 15-16. The ALJ then determined that Kinnari's impairments did not meet or equal the severity of a list impairment (step 3). *Id.* at 16-19. Further, the ALJ determined that Kinnari's mental impairments did not satisfy the Paragraph B criteria because she experienced only moderate limitations in understanding, remembering, or applying information, moderate limitations in interacting with others, moderate limitations in concentrating, persisting, or maintaining pace, and moderate limitations in adapting or managing oneself. *Id.* at 18-19.

The ALJ next determined that Kinnari had the RFC to perform light work with the following physical limitations: needs to alternate her position between sitting, standing,

---

[1]      To be eligible for DIB, a claimant must show that she was disabled as of her date last insured. *See Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012).

and walking for no more than five minutes out of every half hour and while doing so, she would not need to be off task; can occasionally push and pull with her upper extremities and occasionally operate foot controls; can occasionally climb ramps and stairs and occasionally stoop, kneel, balance, crouch and crawl; no climbing of ladders, ropes or scaffolds; can occasionally reach overhead but frequently reach in all other directions; can frequently engage in fine and gross manipulation but no forceful grasping or torqueing; can continuously engage in fine manipulation such as typing or writing for twenty minutes at a time, after which she needs to rest her hands or perform other manual activities briefly before returning to the prior activity; no exposure to excessive humidity; cannot be exposed to hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights or around exposed flames; and cannot sustain concentrated exposure to unguarded hazardous machinery. (R. 20).

The ALJ found Kinnari had the mental RFC to perform simple, routine tasks; work involving no more than simple decision-making; no more than occasional and minor changes in the work setting; work requiring the exercise of only simple judgment; no multitasking; work requiring an average production pace; no significantly above average or highly variable production pace work; no work which requires significant self-direction; no work involving direct public service, in person or over the phone; can tolerate brief but superficial interaction with the public which is incidental to her primary job duties; no work in crowded, hectic environments; brief and superficial interaction with supervisors and co-workers but no tandem tasks. (R. 20). Given this RFC, at step 4, the ALJ concluded that Kinnari could not perform her past work as a database administrator and sales representative, door-to-door. *Id.* at 27. At step 5, the ALJ concluded that Kinnari could

perform other jobs identified by the VE including mail clerk, inspector, surveillance system monitor, and bonder. *Id*. at 28. Based on this step 5 finding, the ALJ found that Kinnari was not disabled. *Id.* The Appeals Council denied Kinnari's request for review on December 11, 2018, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-6; *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## DISCUSSION

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal

criteria. *See Villano*, 556 F.3d at 562; *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and h[is] conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Kinnari raises three issues in support of her request for reversal of the ALJ's decision: (1) the ALJ failed to properly account for her moderate limitations in concentration, persistence, or pace in the RFC assessment; (2) the ALJ inappropriately discounted her treating physician's opinion (Dr. Ambereen Ghani); and (3) the ALJ improperly discounted her subjective symptoms. The Court affirms the ALJ's decision because his findings are supported by substantial evidence. Specifically, Kinnari primarily disputes the ALJ's ultimate finding, but a mere disagreement with the ALJ does not warrant remand. Rather, this case is an example of where the ALJ considered the evidence, built a

logical bridge between the evidence and his conclusion, and sufficiently explained his rationale. As the Supreme Court recently stated, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is 'more than a mere scintilla.'" *Biestek*, 139 S. Ct. at 1154. Here, the ALJ has sufficiently supported his conclusion with evidence, which evidence is definitely more than a mere scintilla, the Court can follow the ALJ's analysis in conducting a meaningful review, and a reasonable mind could accept the conclusion reached. Thus, this Court cannot and does not reweigh the evidence or substitute its own judgment for that of the ALJ. Accordingly, for the reasons stated below, remand is not appropriate.

**A.      Concentration, Persistence, or Pace Limitations**

Kinnari argues that the ALJ's RFC finding fails to adequately account for her moderate deficiencies in concentration, persistence, or pace. "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Supt. P, App. 1 § 12.00C(3). Both "'the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record,' including even moderate limitations in concentration, persistence, or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). Kinnari is correct that limiting a claimant to "unskilled" work does not generally "incorporate[] a claimant's full range of CPP limitations—challenges concentrating, staying on task, and maintaining a given pace in the workplace." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). That is because "the relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular

workplace." *Id*; SSR 85–15, 1985 WL 56857 at *6 (Jan. 1, 1985) ("the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job.").

Nevertheless, the Seventh Circuit has accepted "an ALJ's hypothetical [and corresponding RFC] omitting the terms 'concentration, persistence [or] pace' when it [is] manifest that the ALJ's alternative phrasing specifically exclude[s] those tasks that someone with the claimant's limitations would be unable to perform." *Saunders v. Saul*, 777 F. App'x 821, 825 (7th Cir. 2019) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)). Moreover, "an ALJ may reasonably rely upon the opinion of a medical expert who translates [moderate concentration, persistence, or pace] findings into an RFC determination." *Burmester*, 920 F.3d at 511; *see also Milliken v. Astrue*, 397 F. App'x 218, 221-22 (7th Cir. 2010); *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (no error where physician translated moderate mental limitations into a specific RFC assessment that the plaintiff could still perform low-stress, repetitive work).

Here, when assessing the "paragraph B" criteria, the ALJ found that Kinnari has moderate limitations in concentrating, persisting, or maintaining pace. (R. 19). Kinnari appears to first contend that the ALJ erroneously concluded that she had only moderate (as opposed to marked) limitations in concentration, persistence, or pace. *See* Doc. 15 at 8. As Kinnari notes, the ALJ relied on her psychotherapist's diagnostic assessment on August 3, 2015 that her attention and concentration were within normal limits. (R. 19). The ALJ further relied on the opinions of the state-agency psychologists, who found no marked limitations in concentration, persistence, or pace. *Id*. at 25, 82, 97-98.

Kinnari does not explain how the evidence that she cites in her brief shows greater limitations in concentration, persistence, or pace than those found by the ALJ. Doc. 15 at 8. Regardless, none of the evidence listed supports a finding of marked limitations in this domain. Kinnari first cites her subjective reports to her providers, faulting the ALJ for failing to mention that her psychotherapist noted on the assessment that she suffers symptoms of chronic fatigue, difficulty concentrating, irritability, racing thoughts, and mood swings. (R. 394). These symptoms are listed under the "History of the Present Illness" portion of the report, which does not reflect an "objective assessment or opinion" but "the patient's subjective statements about the problem for which she is seeking care and a history of that problem, if any." *Snedden v. Colvin*, 2016 WL 792301, at *9 (N.D. Ill. Feb. 29, 2016) (citations omitted). Kinnari argues that other psychiatric treatment notes suggest that her attention and concentration was often not within normal limits. As an example, Kinnari cites therapy progress notes dated August 17, 2015 which indicated "symptoms" of concentration problems, sleep disturbance, mood swings, irritability, and hopelessness. (R. 413). These symptom notations also appear to be based on Kinnari's own account of her mental symptoms and cannot be construed as medical opinions. Kinnari's second example is a psychiatric progress note dated August 19, 2015 which shows that a mental status examination revealed a depressed mood and constricted range. *Id*. at 412. But the therapist noted no impairment in Kinnari's attention and concentration, and a depressed mood and constricted range does not necessarily equate to impaired attention and concentration, let alone a marked limitation.

In any event, even if the ALJ erred in finding Kinnari only had moderate limitations in concentration, persistence, or pace, as opposed to marked limitations, any error was

harmless because a claimant's impairments must cause "marked" limitations in at least two domains of functioning or an "extreme" limitation in one domain of Paragraph B in order to satisfy a listing. *Juozas V. v. Saul*, 2019 WL 4280482, at *2 (N.D. Ill. Sept. 10, 2019). The ALJ found that Kinnari had moderate limitations in all four Paragraph B areas, and Kinnari does not challenge any of the ALJ's findings in the three other areas. (R. 18-19). Thus, the result would have been the same at step three no matter what rating was assigned to Kinnari's concentration, persistence, and pace. *Rodriguez v. Astrue*, 2013 WL 1767664, at *7 (N.D. Ill. Apr. 24, 2013).

Contrary to Kinnari's assertion, the ALJ did not improperly assume that a moderate limitation in concentration, persistence, or pace indicates that an individual can engage in unskilled work on a full-time basis. Rather, the ALJ in this case relied on the expert opinions of the state-agency psychologists who adequately captured Kinnari's moderate limitations in concentration, persistence, or pace. In making this mental RFC determination, the ALJ gave significant weight to the September 22, 2015 and February 3, 2016 opinions from the state-agency psychologists Russell Taylor, Ph.D., and Ellen Rozenfeld, Psy.D., because they have specialized knowledge in evaluating mental impairments under the disability standards of the Social Security Administration, their opinions were supported by the medical and other evidence in cited in their determinations, and their opinions were generally consistent with the evidence presented at the hearing, including the absence of any significant mental health treatment. (R. 25); *see Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) (an "ALJ may rely on a doctor's narrative where it adequately translates those worksheet observations."); *Capman v. Colvin*, 617 F. App'x 575, 579 (7th Cir. 2015) (an ALJ "may reasonably rely on the examiner's narrative

in Section III ... where it is not inconsistent with the findings in the Section I worksheet."). Kinnari does not challenge the weight the ALJ assigned to these opinions.

The state-agency psychologists completed the worksheet summary in Section I of the mental RFC assessment. (R. 81-83, 97-99)  Dr. Taylor found in the Section I worksheet of the mental RFC assessment that Kinnari is moderately limited in three areas related to concentration, persistence, and pace: (1) the ability carry out detailed instructions; (2) the ability to maintain attention and concentration for extended periods; and (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. *Id*. at 82.  As for her "social interaction limitations," Dr. Taylor opined that Kinnari was moderately limited in her ability to interact appropriately with the general public. *Id*.  For her "adaptation limitations," Dr. Taylor concluded that Kinnari was moderately limited in her ability to respond appropriately to changes in the work setting. *Id*. at 83.

On reconsideration, another state agency psychologist, Dr. Rozenfeld, concluded that Kinnari was moderately limited in the same three areas related to concentration, persistence, and pace: (1) the ability carry out detailed instructions; (2) the ability to maintain attention and concentration for extended periods; and (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 97-98)  As for her "social interaction limitations," Dr. Rozenfeld found Kinnari moderately limited in the ability to: interact appropriately with the general public; accept instructions and respond appropriately to criticism for supervisors; get along with

coworkers or peers without distracting them or exhibiting behavioral extremes. *Id*. at 98.

Like Dr. Taylor, Dr. Rozenfeld opined that Kinnari's ability to respond appropriately to

changes in the work setting was moderately limited for her "adaptive limitations" *Id*.

Both Dr. Taylor and Dr. Rozenfeld found that Kinnari is not significantly limited

in the five remaining concentration, persistence, or pace areas:  (1) the ability carry out

very short and simple instructions; (2) the ability to perform activities within a schedule,

maintain regular attendance, and be punctual within customary tolerance; (3) the ability to

sustain an ordinary routine without special supervision; (4) the ability to work in

coordination with or in proximity to others without being distracted by them, and (5) the

ability to make simple-work related decisions. (R. 82, 97-98).  Dr. Taylor and Dr.

Rozenfeld opined that Kinnari does not have any understanding and memory limitations.

*Id*. at 82, 97.

In their narrative assessments, Dr. Taylor and Dr. Rozenfeld made clear that

Kinnari's primary problem is with sustaining persistence and pace for detailed/complex

tasks.  Dr. Taylor explained in the narrative discussion that despite Kinnari's sustained

concentration and persistence limitations, she can: "understand and remember simple and

detailed instructions;" "sustain concentration and persist well enough to carry out simple

tasks for a normal work period within the limits of her medical status;" and "make simple

work related decisions." (R. 83).  In Dr. Rozenfeld's narrative section, she explained that

Kinnari's "ability to carry out tasks with adequate persistence and pace would be

moderately impaired for detailed/complex tasks but adequate for completion of routine,

repetitive tasks." *Id*. at 98.  Dr. Rozenfeld concluded: "Overall, from a psychological

perspective, the clmt retains the ability to perform simple repetitive tasks on a sustained

basis in a work setting with occasional contact with others and routine workplace changes." *Id.* at 99. The ALJ accounted for these findings by limiting Kinnari to simple, routine tasks, work involving no more than simple decision-making, work requiring the exercise of only simple judgment and an average production pace and precluding work requiring multitasking, significant self-direction, and significantly above average or highly variable production pace work along with a workplace adaption limitation and social restrictions limiting her interactions with the public, supervisors, and coworkers and excluding work in crowded, hectic environments. *Id.* at 20.

In *Dudley v. Berryhill*, 773 F. App'x 838 (7th Cir. 2019), the Seventh Circuit upheld a similar mental RFC determination when it sufficiently accounted for the claimant's demonstrated psychological symptoms. The ALJ in *Dudley* accounted for the claimant's moderate limitations in concentration, persistence, and pace—the greatest of which were stress- and pain-related—by limiting her to "simple, routine and repetitive tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment," "by excluding work above an average pace, at a variable pace, or in crowded, hectic environments, and by limiting her interactions with the public, supervisors, and coworkers." *Id.* at 842. The limitation to "work requiring the exercise of only simple judgment" specifically accounted for the claimant's concentration difficulties. *Id.* In arriving at this RFC, the ALJ gave significant weight to the opinions of the state agency psychologists, who were the only sources to opine on the issue of Dudley's mental functional work-related limitations. *Dudley v. Berryhill*, 2018 WL 1152108, at *5, 7 (E.D. Wis. March 5, 2018). The Seventh Circuit recognized that "an ALJ may rely on a doctor's

narrative where it adequately translates those worksheet observations." *Dudley*, 773 F. App'x at 843. Moreover, the hypothetical posed to the VE in *Dudley* "contained limitations that were *more* restrictive than the functional work-related limitations identified by the state-agency doctors." *Id*. at 842. For example, the ALJ's stated limitations precluded the claimant from tandem tasks with supervisors and coworkers as well as work above an average or variable pace. *Id*. "Critically, Dudley did not identify any limitations that the ALJ omitted and should have been included in the [RFC] and hypothetical question." *Id*.

Similarly, the ALJ in this case properly accounted for Kinnari's affective disorder and anxiety issues by incorporating all concentration, persistence, or pace limitations supported by the record in the RFC. Both state-agency psychologists clarified in the narrative sections that the moderate limitations in attention and concentration for extended periods and in the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length and rest periods were limited to detailed and complex tasks. The ALJ's mental RFC closely tracked the limitations identified in the narrative sections of the state-agency psychologists. (R. 20, 83, 98, 99). The ALJ also reached more restrictive conclusions about Kinnari's functional work-related limitations than identified by the state-agency psychologists by precluding Kinnari from work involving tandem tasks with supervisors and co-workers as well as work above an average or highly variable production pace and requiring significant self-direction. These limitations exceeded the opinion of Dr. Taylor, who concluded that Kinnari could "sustain concentration and persist well enough to carry out simple tasks for a normal work period"; that Kinnari "can interact and communicate sufficiently in a work setting with reduce social/interpersonal demands;

and that Kinnari "could adapt to simple, routine changes and pressures." *Id*. at 83. The ALJ's RFC limitation was more restrictive than suggested by Dr. Rozenfeld, who opined that Kinnari would be moderately impaired for detailed and complex tasks but adequate for completion of simple, routine, repetitive tasks on a sustained basis in a work setting with occasional contact with others and routine workplace changes. *Id*. at 98, 99. Like in *Dudley*, the state agency psychologists were the only mental health professionals to opine on Kinnari's mental functional capacity. *Dudley*, 773 F. App'x at 843 ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error."). Finally, Kinnari does not contend that Dr. Taylor's and Dr. Rozenfeld's narratives failed to include any limitations the psychologists found in the worksheet portions of the mental RFC forms. *See DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019) ("But even if an ALJ may rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms such as the PRT and MRFC forms.").

Kinnari cites certain evidence in the record, including her hearing testimony and her adult function reports, which she believes supports her assertion that the ALJ's mental RFC assessment failed to accommodate limitations in her concentration, persistence, or pace. (Doc. 15 at 9) (citing Kinnari's statements that she needs to lie down two or three times a day for 30 to 40 minutes each to relieve pain, is restless and tired all the time, wakes up two to three time a night due to depression and anxiety attacks, and her condition interferes with her ability to concentrate, focus, and handle stress and changes in routine). However, the ALJ explicitly and accurately cited this evidence and properly determined that Kinnari's statements were not fully credible as further discussed below. (R. 21).

Although Kinnari does not agree with how the ALJ viewed this evidence, the ALJ considered this evidence in his decision and built an accurate and logical bridge from the evidence to his conclusion regarding her moderate limitations in concentration, persistence, or pace. In arguing that the ALJ ignored the severity of her impairments in assessing her limitations in concentration, persistence, or pace, she seems to be asking the court to reweigh the evidence and come to a different conclusion. The Court will not reweigh the evidence or substitute its judgment for that of the ALJ's. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013)

Kinnari also argues that the ALJ failed to account for the effects of her migraine headaches citing: (1) her hearing testimony that she suffers migraines two to three times a month which each last three to four days, (2) a treatment record from Dr. Ghani dated March 18, 2015 stating that Kinnari reported headaches and dizziness rendering her unable to function, and (3) a treatment note from Dr. Ghani dated July 13, 2015 indicating that Kinnari reported headaches and continuing to struggle with chronic pain. (Doc. 15 at 9). Kinnari's argument is not persuasive.

While the ALJ's decision does not appear to contain an explicit reference to the migraine-related evidence cited by Kinnari, the ALJ does not have a duty to explicitly discuss every single piece of evidence in the record as long as he builds a logical connection between the evidence and his conclusion. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017). The ALJ did that here, clearly acknowledging that Kinnari had been diagnosed with migraine headaches and discussing the severity of her headaches. At step two, the ALJ found that Kinnari's migraine headaches were a severe impairment. (R. 16). While there is no listing that specifically addresses migraine headaches, the ALJ noted at step

three that he considered Kinnari's headaches under the most analogous listings, 11.02B and 11.02D. *Id*. at 16-17. The ALJ determined that Kinnari's headaches did not meet the criteria of either Listing 11.02B or 11.02D, a conclusion that Kinnari does not contest. *Id*. at 17. Specially, the ALJ noted that Kinnari told an ear, nose, and throat specialist in May 2015 that she had been having daily headaches since December 2014. *Id*. at 17. Moreover, the ALJ noted that Kinnari "reported that she had been seen by a neurologist, but no records from this consultation were submitted. She reported that she was prescribed Topamax but did not start it." *Id*. In his RFC assessment, the ALJ noted that Kinnari complained of worsening pain and headaches to Dr. Bruce Johnson, her rheumatologist, in January 2016 and March 2016. *Id*. at 24, 755-62. The ALJ pointed out that Dr. Johnson adjusted Kinnari's medications, referred her to a neurologist and directed her to return in three months. *Id*. Importantly, Dr. Johnson did not assess any headache-related limitations on attention and concentration. Rather, Dr. Johnson instructed Kinnari to be "more religious" about her home exercise program and "walk more." *Id*. Further, as the ALJ noted, there is no evidence that Kinnari followed through with the neurology referral and no additional treatment with Dr. Johnson or any other rheumatologist is documented. *Id*.

Kinnari does not explain how the migraine-related evidence she cites demonstrates that the ALJ failed to adequately accommodate her limitations in concentration, persistence, or pace. In any event, Dr. Taylor and Dr. Rozenfeld reviewed and considered Dr. Ghani's records and Kinnari's adult function reports in determining Kinnari's mental RFC, the ALJ found that Dr. Taylor's and Dr. Rozenfeld's opinions were consistent with Kinnari's testimony at the hearing, and Kinnari does not argue error in the ALJ's determination to accord significant weight to the state-agency psychological consultants'

opinions. (R. 25). Again, the ALJ permissibly relied on the state-agency psychological consultants in crafting a mental RFC and Kinnari does not identify any further work-related functional limitation which she believes would be required by the headaches. *Morrison v. Saul*, 2020 WL 1158480, at *4 (7th Cir. 2020) (holding any error in the RFC was harmless because the claimant did not "offer any additional restrictions that he believe[d] should have been included in the RFC" related to his limitations in concentration, persistence, and pace).

On this record, the Court finds that the ALJ reasonably accounted for all the moderate limitations in maintaining concentration, persistence, or pace supported by evidence in the record and developed a mental RFC supported by substantial evidence. The ALJ's findings are consistent with the state-agency psychologists' opinions which the ALJ reasonably afforded significant weight. Accordingly, remand is unwarranted on this basis.

Kinnari next argues that "[o]n top of her severe mental impairments, [her] widespread, chronic pain would constantly interfere with her ability to function. Her need to lie down, in and of itself, would be work preclusive." Doc. 15 at 9. She asserts that the ALJ's failure to recognize her need to lie down constitutes reversible error. This underdeveloped argument is without merit. Kinnari testified that she must lie down two or three times per day for thirty to forty minutes at time. (R. 48-49). Aside from Dr. Ghani's opinion, which the ALJ did not err in rejecting, no physician opined that Kinnari had to lie down during the day. *Id*. at 25 (ALJ noting that Kinnari's "treatment providers did not describe any medical need for [her] to lie down during the day as she described during her testimony."). Substantial evidence supports the ALJ's failure to credit Kinnari's testimony

that she had to lie down during the day. *Imse v. Berryhill*, 752 F. App'x 358, 362 (7th Cir. 2018) ("as the ALJ noted, '[n]o physician, treating or otherwise, has ever indicated that there was a medical reason why she would need to lay down/nap as frequently as alleged during the day.'").

## B.     Weight Afforded Treating Physician's Opinion

Kinnari next contends that the ALJ improperly rejected the opinion of her treating physician Dr. Ghani that she: (1) could sit or stand/walk for less than two hours each in an eight hour workday; (2) could engage in fine manipulation for only 30 percent of a workday; and (3) would be absent from work four days per month or more as a result of her symptoms.  The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record" 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 874 n.1 (7th Cir. 2018) (for claims filed before March 27, 2017, an ALJ "should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record.").  An ALJ must "offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Walker v. Berryhill,* 900 F.3d 479, 485 (7th Cir. 2018). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *see* 20 C.F.R. § 404.1527(c).

Kinnari argues that the ALJ erred in failing to give controlling weight to Dr. Ghani's October 2015 opinion and ignored the regulatory factors in assigning her opinion little weight. The diagnoses listed in Dr. Ghani's opinion are fibromyalgia, migraine headaches, anxiety, carpal tunnel, bilateral tennis elbow, chronic pain syndrome, herniated disc, and lumbar sprain. (R. 460). The positive objective signs listed are reduced range of motion in elbows and wrists, reduced grip strength, sensory changes, impaired sleep, weight change, tenderness, trigger points, swelling, muscle spasm, muscle weakness, and positive straight right leg raising. *Id.* Dr. Ghani found the following limitations: Kinnari can walk just one city block without rest or severe pain; can sit 30 minutes at one time before needing to get up; can stand 15 minutes at one time before needing to sit down; can only sit and stand/walk a total of less than two hours in an eight hour work day; needs to walk around every 30 minutes for six minutes each time; can rarely lift less than 10 pounds; can never twist, stoop (bend), or climb ladders; can rarely crouch/squat; can occasionally climb stairs; can use arms 20 percent and fingers 30 percent of a workday for repetitive activities; can never use hands for repetitive activities during a workday; impairments will likely produce "good days" and "bad days;" and would likely be absent from work more than four days per month as a result of the impairments. (R. 461-62). Dr. Ghani opined that Kinnari's pain or other symptoms are severe enough to frequently interfere with the attention and concentration needed to perform even simple work tasks and Kinnari is incapable of even "low stress" jobs. *Id*. at 460-61.

The ALJ assigned little weight to Dr. Ghani's RFC assessment. (R 26). In discounting Dr. Ghani's opinion, the ALJ explained that: (1) Dr. Ghani did not provide an adequate explanation of the evidence relied on in support of her conclusions, especially

with regard to the degree of absenteeism she found; (2) her treatment notes do not reflect that Kinnari was experiencing such significant difficulties and limitations; and (3) her opinions were inconsistent with other substantial evidence of record, including Kinnari's overall conservative course of treatment, consultative examination findings, and Kinnari's activities of daily living. *Id*.

While Dr. Ghani regularly treated Kinnari for over four years, the ALJ gave good reasons for finding that Dr. Ghani's proposed limitations are more restrictive than the record as a whole can support. The ALJ's first rationale for discounting Dr. Ghani's opinion is well supported. Dr. Ghani's October 2015 opinion contains no explanation for the extreme limitations she assessed. (R. 460-62). As the ALJ noted, the check-box form contains "little explanation" of the medical or other evidence relied on to support Dr. Ghani's conclusions. *Id*. at 26. The Seventh Circuit has characterized such check-box form with no supporting narrative as "weak evidence" when the findings are inconsistent with the medical record. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *see also Gebauer v. Saul*, 2020 WL 261231, at *4 (7th Cir. 2002) *McFadden v. Berryhill*, 721 F. App'x 501, 505 (7th Cir. 2018) ("The ALJ reasonably demanded from [the treating physician] some explanation for finding limitations so much more severe than those recognized by other doctors, and she was entitled to discount his opinion for not providing that explanation."); 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion ... the more weight we will give that opinion.").[2]

---

[2]     Kinnari finds it "ironic" that the ALJ discounted Dr. Ghani's opinion because it was on a "check-box form" that "provided little explanation" but he also gave significant weight to the state agency consultants' opinions, which are "generally presented on check the box forms." (Doc. 15 at 13). This argument ignores the narrative explanations the state agency consultants provided in addition to the check-boxes on the assessment forms. (R. at 79-81, 83, 96-99). The ALJ also explained that he assigned greater weight to the state agency consultants' opinions because he

The ALJ properly recognized the absence of any explanation for Dr. Ghani's conclusion regarding Kinnari's anticipated work absences. Specifically, Dr. Ghani did not point to or identify any clinical findings or otherwise explain why Kinnari's impairments would lead her to miss more than four days of work per month. Furthermore, there is nothing in Dr. Ghani's treatment records which substantiates the frequency of absences she found. Dr. Ghani's treatment notes from the same day she completed the RFC questionnaire provide no explanation whatsoever regarding the degree of absenteeism she found. (R. 446-48). Overall, Kinnari's treatment records reflect one instance on March 18, 2015 when she report to Dr. Ghani that her headaches rendered her unable to function. *Id.* at 322. Although Kinnari continued to report headaches to Dr. Ghani, Dr. Ghani did not note any further complaints of being unable to function due to headaches or otherwise. Kinnari stated in June 2015 that she goes outside daily and in January 2016 that she tries to go outside on a daily basis. *Id.* at 210, 241. Moreover, at subsequent visits on August 5, 2016, August 24, 2016, October 10, 2016, and July 31, 2017, Dr. Ghani noted that Kinnari was in "[g]eneral able to do usual activities, [had] good exercise tolerance, and [was in] good general state of health." *Id.* at 708, 711, 713, 725. Significantly, Kinnari has cited nothing in the record which supports Dr. Ghani's conclusion as to expected work absences. The ALJ reasonably rejected Dr. Ghani's conclusory opinion in this regard. *See Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010) (finding that the ALJ reasonably discounted the treating physician's opinion about claimant missing a week or more of work a month where the treating physician "did not explain his opinion and his treatment notes do not clarify

---

found them "supported by the medical and other evidence cited in their disability determination explanations" and they were "generally consistent with the evidence presented at the hearing level." *Id.* at 25.

the doctor's reasoning"); *Gildon v. Astrue*, 260 F. App'x 927, 929 (7th Cir. 2008) ("An ALJ is not required to accept a doctor's opinion if it 'is brief, conclusory, and inadequately supported by clinical findings."); *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir.2000) (noting that an ALJ may reject a treating physician's opinion that is "conclusory and unsupported by evidence").

Second, as the ALJ pointed out, Dr. Ghani's own treatment notes do not reveal significant findings or symptoms. "An ALJ may give less weight to an opinion that is unsupported by objective evidence." *Vang v. Saul*, 2020 WL 865397, at *3 (7th Cir. 2020). "And if the presence of objective indicators … makes a claim more plausible, their absence makes it less so." *Id*. (quoting *Parker v. Astrue*, 579 F.3d 920, 9230 (7th Cir. 2010)). Because Kinnari's physical impairments were caused by fibromyalgia along with other impairments, including orthopedic conditions such as degenerative disc disease and osteoarthritis of the left knee, it was appropriate for the ALJ to consider whether Dr. Ghani's treatment notes contained objective findings consistent with her opinions. In addition to her diagnosis of fibromyalgia, Dr. Ghani found that Kinnari suffered from migraine headaches, carpal tunnel syndrome, bilateral tennis elbow, herniated disc, lumbar sprain/spasm, anxiety, and chronic pain syndrome. (R. at 460).

The ALJ found Dr. Ghani's opinion consistent with her own conservative treatment of Kinnari. As the Commissioner points out, Dr. Ghani opined that Kinnari would need to lie down for half of a workday. The ALJ reviewed Dr. Ghani's examination findings (R. 22-24) and correctly found: "Dr. Ghani frequently reported in her treatment notes that claimant did not appear uncomfortable and that her overall musculoskeletal examination findings were largely normal." *Id*. at 26. The ALJ noted few abnormal examination

findings by Dr. Ghani. *See Id.* at 22 (8/19/2014—noting tenderness with flexion and extension of the back but musculoskeletal and neurological examination was otherwise remarkable and straight leg raise test was negative); *id.* (9/4/2014—noting tenderness and limited flexion and extension of the lumbar spine and right left straight leg raise test was equivocal but MRI findings of lumbar spine were characterized as mild); *id.* at 23 (8/12/2015—noting subjective decreased sensation in the upper extremities and decreased neck suppleness but no further neurological or musculoskeletal abnormalities were documented); *id.* at 24 (10/20/2015—noting overall musculoskeletal system findings were normal aside from decreased range of motion in the bilateral upper extremities due to pain for tennis elbow and carpal tunnel); *id.* (4/4/2017) (noting report of left knee pain for three weeks but degenerative joint disease seen on x-rays taken at that time was characterized as mild).

Given the limited abnormal findings by Dr. Ghani, the ALJ reasonably inferred that her opinion may have been attributed to an over-reliance on Kinnari's self-reported symptoms in completion of the RFC form, which constitutes a good reason for denying Dr. Ghani's opinion controlling weight. (R. 26); *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). Kinnari does not specifically dispute that Dr. Ghani relied on her subjective reports in formulating her RFC opinion. The record supports the ALJ's assessment because there were minimal objective findings to corroborate Kinnari's account of disabling symptoms and pain in her back, left knee, and upper extremities. Without objective evidence explaining or supporting Dr. Ghani's extreme sitting, standing, walking, and gross and fine manipulation limitations and degree of expected absences, the ALJ did not err in affording partial weight to her opinions. *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012) ("The

ALJ rightly emphasized that Dr. Preciado's sweeping conclusions lacked support in his own treatment notes.").

Next, the ALJ correctly observed that Dr. Ghani's opinion was inconsistent with other substantial evidence in the record, including Kinnari's overall conservative course of treatment, the consultative examiner's findings, and Kinnari's activities of daily living. (R. 26). The ALJ properly evaluated the type of treatment Dr. Ghani prescribed in response to Kinnari's complaints and other symptoms. When weighing a physician's opinion, the ALJ is instructed to consider the "treatment that the source has provided." 20 C.F.R. § 404.1527(c)(2)(ii). According to the ALJ, Kinnari's treatment "has been essentially conservative in nature, consisting mostly of medication management by general practitioners" and a few sessions of chiropractic care. (R. 24). Kinnari has not explained why the ALJ's determination in this regard was error.

In discounting Dr. Ghani's opinion, the ALJ also placed significance on the consultative examiner's findings.[3] The ALJ adequately explained which portion of the consultative examiner's findings was inconsistent with Dr. Ghani's opinion. In particular, the ALJ noted that Dr. Ghani's opinion that Kinnari can never use her hand for grasping or turning objects appeared inconsistent with the consultative examiner's finding that Kinnari could button, zip, and tie shoelaces. (R. 26, 406). Notably, Kinnari does not provide any argument challenging the consultative examiner's findings or the ALJ's reliance on those

---

[3] In August 2015, Dr. Roopa Karri, a consultative examiner, found 16/18 tender points positive for fibromyalgia. (R. 406). She also found decreased grip strength (3/5) in both hands and slightly decreased strength in Kinnari's arms, with moderate difficulty squeezing the blood pressure pump with either hand. *Id*. However, she pointed out that Kinnari was able to make fists and oppose fingers and could button, zip, and tie shoelaces. Dr. Karri found reduced range of motion of the cervical and lumbar spine. *Id*. Dr. Karri also found a negative straight leg raise test, a normal sensory examination, and normal range of motion of the shoulders, elbows, wrists, hips, knees, and ankles. *Id*.

findings in discounting Dr. Ghani's opinion. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (as long as he minimally articulates his reasons, "[a]n ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician."). Also, the ALJ considered Dr. Ghani's opinion that Kinnari could never use her hands for grasping or turning objects to be inconsistent with Kinnari testimony that she drove 20 minutes to the hearing without stopping. (R. 26, 59). Kinnari also disputes the ALJ's rejection of Dr. Ghani's opinion that she could engage in fine manipulation for only 30 percent of an 8-hour workday. *Id*. at 462. In making this argument, Kinnari relies solely only her own testimony at the hearing that she experiences pain, numbness, and tingling in both arms and is unable to engage in repetitive work like writing or typing without her arm "shaking and jam[ing] up on" her. Doc. 15 at 14 (citing R. 41, 46). The ALJ explicitly considered the testimony relied upon by Kinnari (R. 21), weighed it against the record as a whole, including the state agency consultants' opinion as to her unlimited ability to perform fine manipulations, and determined that Kinnari's allegations were not fully credible. *Id*. at 25, 80, 96.

There was other medical evidence contradicting the extreme limitations in Dr. Ghani's RFC assessment, which the ALJ noted elsewhere in his decision. For example, from July 2015 to March 2016, Dr. Bruce Johnson, a rheumatologist, treated Kinnari for her fibromyalgia. (R. 738-62). During this time, Dr. Johnson recommended exercise. *Id*. at 745 ("we went over the importance of exercise. [T]o slowly increase walking"); *id*. at 749 ("continue exercise); *id*. at 761 ("be more religious about the exercises and walk more."). Dr. Johnson also examined Kinnari numerous times. *Id*. at 739, 744, 748, 752, 756, 760. At various examinations, Dr. Johnson noted positive tenders points but "[a]ll

joints [were] normal" and her spine was normal. *Id*. at 23-24, 739, 744, 748, 756. As the ALJ indicated, on November 2, 2015, Dr. Johnson observed that Kinnari's fibromyalgia was stable and slightly improved. *Id*. at 24, 753. Further, Dr. Ghani's opinion was inconsistent with the state agency medical and psychological consultants opinions that Kinnari was capable of performing a modified range of light work. *Id*. at 25, 73-85, 87-101.[4]

Kinnari points to several findings and imaging test results, but they indicate mostly mild and sometimes moderate symptoms. Doc. at 13. As the Commissioner notes, Dr. Ghani did not reference the lumbar spine MRI or EMG results in providing her opinion. Even if she had, the mild MRI results and EMG's finding of neuropathy do not, on their own, support an inability to work at all exertional levels. In any event, the state agency physician on reconsideration reviewed such imaging as well as Dr. Ghani's opinion and concluded that Kinnari could perform a range of light work. Moreover, the ALJ considered this evidence in combination earlier in his written discussion and concluded that the record as a whole did not support Dr. Ghani's opinion that Kinnari could sit or stand/walk each for less than two hours in an eight hour workday, could engage in fine manipulation for only 30 percent of a workday, and would likely be absent from work more than four days per month as a result of her impairments, especially since Dr. Ghani failed to provide a supportive explanation for these opinions. (R. 16, 23); *Denton v. Astrue*, 596 F.3d 419, 426

---

[4] The ALJ assigned limited weight to Dr. Ranga Reddy's opinion at the initial level that Kinnari could use her hands from 0 hours to 2 hours and 40 minutes out of an eight-hour workday because this one aspect of his opinion was vague and not included on reconsideration. (R. 25, 80, 96-97). Kinnari does argue that it was error for the ALJ to assign only limited weight to this portion of Dr. Reddy's opinion.

(7th Cir. 2010) ("The ALJ specifically addressed all the evidence that Denton points out, though he did not assign the significance to it that Denton prefers.").

The ALJ further found that Dr. Ghani's assessed limitations were inconsistent with Kinnari's daily activities. (R. 26). The ALJ emphasized that Kinnari's daily activities fail to suggest greater limitations than those included in the RFC, noting that she is able to prepare simple meals like sandwiches or frozen dinners, eat out once or twice a month, do laundry and some cleaning, drive, drop off and pick up her children at school, attend their school and extracurricular activities, shop for groceries, pay bills and handle bank accounts. *Id*. at 25, 49-53 209-11, 240-42. In adult function reports dated June 22, 2015 and January 6, 2016, Kinnari stated that she left the house or tries to leave the house "daily." *Id*. at 210, 241. As the ALJ noted, Kinnari reported to Dr. Karri during an August 18, 2015 consultative exam that she "can drive and do chores." *Id*. at 23-24, 405. The ALJ pointed out other ways in which Kinnari's claim of totally disabling pain was undermined by her own statements about her daily activities. For example, in a pain questionnaire received January 6, 2016, Kinnari stated that she is able to do "light housekeeping" (i.e. dusting, cooking, etc.) without assistance and errands such as going to the Post Office or grocery store without assistance. *Id*. at. 25, 237.

Contrary to Kinnari's argument, the ALJ did consider the relevant factors in assigning little weight to Dr. Ghani's opinion. The ALJ explicitly noted that Dr. Ghani was Kinnari's "primary care physician" and a general practitioner. (R. 22, 26). Dr. Ghani's lack of specialization is a sufficient and legitimate reason to discount her opinion. 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is

not a specialist."). The ALJ considered the length, nature and extent of the relationship and frequency of examination, discussing in detail Dr. Ghani's treatment of Kinnari between February 18, 2014, shortly after the alleged onset date, and April 4, 2017. *Id*. at 22-24. The ALJ discussed the types of tests performed and ordered by Dr. Ghani, including an MRI of the lumbar spine, straight leg raise tests, and x-ray of left knee. *Id.* at 22, 24. The ALJ also considered the consistency and supportability of Dr. Ghani's opinion with the record as a whole. As discussed, the ALJ found Dr. Ghani's inconsistent with the record and not supported because: (1) the ALJ failed to provide an adequate explanation of the evidence she relied on in support of her conclusions, especially with regard to the degree of expected absenteeism; (2) Dr. Ghani's own treatment notes repeatedly noted that Kinnari did not appear uncomfortable and her overall musculoskeletal examination findings were largely normal; and (3) Dr. Ghani's opinion was inconsistent with other substantial evidence in the record, including an overall conservative course of treatment, the consultative examiner's findings regarding Kinnari's ability to button, zip and tie shoelaces, and Kinnari's own account of her daily activities and her ability to drive 20 minutes to the hearing without stopping. *Id*. at 26.

Based upon the foregoing, the Court finds that the ALJ's evaluation of Dr. Ghani's opinion and determination that it should be given little weight is based upon substantial evidence and without legal error. *See Gebauer*, 2020 WL 261231, at *4-5 (holding ALJ properly decided not to give controlling or probative weight to a treating physician's opinion in a fibromyalgia case where the opinion conflicted with the physician's own treatment notes, the claimant's daily activities, a cardiac stress test, and there was a lack of symptoms typically associated with pain); *Kleven v. Colvin*, 675 F. App'x 608, 611 (7th

Cir. 2011) (holding ALJ properly supported his decision not to give controlling weight to the opinions of claimant's treating physician "because they directly contrasted with the opinions of the consulting examiner and the agency consultants, and because the limitations he described were unsupported by his own treatment notes and objective medical findings.").

## C.     Subjective Symptom Evaluation

Kinnari also challenges the ALJ's partial adverse subjective symptom determination.  The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510.  An ALJ must justify his evaluation with "specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support.").  When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017).  Ultimately, "the ALJ must explain her [subjective symptom evaluation] in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted).  Kinnari has not shown that the ALJ's subjective symptom evaluation was patently wrong.

Kinnari testified that she has constant, widespread pain and weakness from fibromyalgia, along with migraine headaches two to three times a month that last three to

four days. (R. 42, 44). Kinnari testified that she needs to lie down two to three times a day for 30 to 40 minutes each time to relieve her pain. *Id*. at 48-49. She further testified that she wakes up two to three times a night due to depression and anxiety attacks. *Id*. at 46. Kinnari stated that she has low energy, has lost interest in activities, and has problems with her memory, concentration, and focus due to pain and her medications. *Id*. at 46-47, 52. As to physical activities, Kinnari testified that she can walk less than 15 minutes before getting weakness in her left knee and spasms in her lower back, stand for ten minutes before her lower back and left knee start hurting, and sit for 30 minutes before her lower back bothers her. *Id*. at 48. Kinnari testified that she experiences numbness, tingling, and pain in her arms and hands, cannot use her hands to grip things for long periods of time, and cannot write or type for more than 20 seconds at a time. *Id*. at 41, 46, 54-55.

The ALJ found that Kinnari's statements regarding the effects of her impairments on her ability to work were not fully credible. (R. 21). The ALJ identified several reasons for finding Kinnari's complaints and alleged limitations partially credible. Specifically, the ALJ assessed Kinnari's symptoms in light of the mild objective findings, medical opinions, conservative course of treatment, gaps in seeking treatment and failure to follow treatment referrals, and the lack of difficulties performing daily activities.

In accordance with the regulations, the ALJ considered the objective medical evidence in making his adverse subjective symptom finding. SSR 16-3p, 2017 WL 5180304, at * 5 ("[O]bjective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms."). The ALJ noted the radiographic evidence of degenerative disc disease, radiographic evidence of degenerative joint disease of the left knee, and electrophysiological evidence

of bilateral ulnar neuropathy. (R. 21). The ALJ further noted positive fibromyalgia tender points, decreased grip strength in both hands, and reduced range of motion of the back and upper extremities on some physical examinations. *Id*. The ALJ found, however, that these clinical and radiological deficits did not reveal an "inability to perform any sustained work activity" and Kinnari's course of treatment had been "essentially conservative in nature." *Id*.

It is true, as Kinnari points out, that the "absence of objective medical corroboration for a complainant's subjective accounts of pain does not permit an ALJ to disregard those accounts." *Ghiselli*, 837 F.3d at 777. But the ALJ did not rely solely on the lack of substantiation in the objective medical evidence to reject the extent of Kinnari's subjective allegations. *Powers,* 207 F.3d at 435 (while an ALJ "may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the officer may consider that as probative of the claimant's credibility."); SSR 16-3p, 2017 WL 5180304, at * 5. "[E]ven in fibromyalgia cases, the administrative law judge is permitted to consider a discrepancy between the medical evidence and a plaintiff's subjective complaints as a factor tending to undermine the plaintiff's credibility. It just can't be the only factor." *Stark v. Astrue*, 2007 WL 5601488, at *14 (W.D. Wis. Mar. 28, 2007), *aff'd*, 278 F. App'x 661 (7th Cir. 2008); *Gebauer*, 2020 WL 261231, at * 4-5 (holding in evaluating the severity of fibromyalgia for purposes of determining an RFC, an ALJ may consider evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption); *Powers*, 207 F.3d at 435 (holding in a case involving fibromyalgia that "[t]he discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative" of credibility).

In this case, the ALJ cited other reasons to support his finding that Kinnari's allegations were not entirely credible. In addition to the lack of objective evidence, the ALJ cited Kinnari's conservative course of treatment as part of his subjective symptoms analysis. *See Simila v. Astrue,* 573 F.3d 503, 519 (7th Cir.2009) (refusing to question ALJ's finding that claimant's course of treatment consisting of various pain medications, several injections, and one physical therapy session was "relatively conservative" when affirming the ALJ's decision); 20 C.F.R. 404.1529(c)(3)(v)). The ALJ highlighted Kinnari's mostly medication management by general practitioners and also noted that Kinnari had a few sessions of chiropractic care. (R. 24). Kinnari claims that medications adjustments by her physicians corroborate her subjective symptoms. However, the ALJ considered Kinnari's medications and pointed to evidence that the medications offered some relief. *Id*. at 24, 96, 753. The ALJ noted that Kinnari's pain medications included Ibuprofen and Neurontin for back pain and Tramadol and Lyrica for fibromyalgia. *Id*. at 22, 24. By August 2016, Kinnari was in a good general state of health and generally able to do her usual activities with good exercise tolerance. *Id*. at 708, 711, 713, 725. The ALJ also noted that Kinnari took medication (Cymbalta) for her mental health symptoms. *Id*. at 25. Kinnari does not dispute that her treatments should be characterized as conservative, and the ALJ's view of Kinnari's treatment history is not unreasonable.[5]

---

[5]  As to Kinnari's mental impairments, the ALJ determined that the objective findings and Kinnari's course of treatment "inconsistent with the degree of alleged by the claimant." (R. 24-25). The ALJ found that Kinnari's "mental health treatment has been quite conservative in nature, consisting of medication and only a few sessions of outpatient therapy. The few detailed mental status examination findings in the record have been largely unremarkable." *Id*. at 25. Citing *Voigt v. Colvin*, 781 F.3d 878 (7th Cir. 2014), Kinnari claims that the ALJ's finding "reveals just the sort of misunderstanding of mental illness that Seventh Circuit judges have warned against." (Doc. 15 at 11). Kinnari's citation to the *Voigt* decision is unpersuasive. In *Voigt*, the Seventh Circuit held that the ALJ "went far outside the record" in discounting the opinion of a psychiatric nurse when he found that if the claimant were "as psychologically afflicted" as the nurse thought, he "would

As the ALJ noted, the record reveals Kinnari's failure to follow up on an ear, nose, and throat specialist's recommendation to seek a sleep study, an orthopedist's instruction to make a follow up appointment after an EMG, Dr. Johnson's recommendation to see a neurologist, and Dr. Ghani's recommendations to see a hand surgeon for a ganglion cyst on Kinnari's left wrist and an orthopedist for her left knee pain. (R. 22-24). Kinnari also reported that she was prescribed Topamax for her headaches but did not start it. *Id.*at 17. When assessing her subjective allegations, the ALJ also mentioned several gaps in time when Kinnari did not seek treatment for upper extremity, back, or knee pain or complain of such pain during medical appointments for other ailments in the interim. *Id.* at 22 (noting Kinnari "made little, if any further mention of any upper extremity symptoms to her treatment providers until more than a year later in May 2015."); *id.* (noting that after a September 10, 2014 MRI of the lumbar spine indicating mild findings "[l]ittle further treatment for any back pain is documented until more than eight months later."); *id.* at 24 (noting Kinnari made "little, if any, mention of problems with her [left] knee until more than three years after the alleged onset date.")

Kinnari does not argue that it was error for the ALJ to note gaps in treatment history and failure to follow through with recommended referrals as evidence that Kinnari's pain was not as severe as alleged without inquiring into possible explanations for these failures. *See* SSR 16-3p**,** 2016 WL 1119029, at *8-9**;** *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). Moreover, the ALJ did not draw an adverse inference about Kinnari's allegations from a lack of treatment. Rather, the ALJ focused on Kinnari's overall conservative course

---

need to be institutionalized and/or have frequent in patient treatment." *Id.* at 876. Here, the ALJ did not cite lack of institutionalization or frequent inpatient treatment in support of his adverse credibility finding.

of treatment. *Summers v. Colvin*, 634 F. App'x 590, 592 (7th Cir. 2016) ("the ALJ's mention of the gaps in treatment was related to his point that the treatment Summers did receive was conservative" and not "an adverse inference about [claimant's] credibility from any lack of treatment."). "And even if the ALJ had concluded that the gaps undermined [Kinnari's] credibility, she has not explained how she was harmed by the ALJ's failure to explore her reasons." *Id.* (noting doctrine of harmless error applies in Social Security cases). Throughout her briefing at the administrative and district court level, Kinnari did not offer any explanation for her gaps in treatment and failure to follow through with multiple referrals for treatment. (R. 273-75, 278-79, 281-85). Kinnari was represented by counsel at the administrative hearing and thereafter and is presumed to have presented her best case for benefits. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017); *Nicholson v. Astrue*, 341 F. App'x. 248, 254 (7th Cir. 2009) ("The degree of the ALJ's responsibility to take the initiative is influenced, if not entirely dictated, by the presence or absence of counsel for the claimant."). [6]

---

[6]    In her testimony, Kinnari indicated that she stopped mental health treatment with a psychiatrist and counselor after less than six months in 2015 "due to insurance problems." (R. 48). Also in her testimony, Kinnari stated that the mental health treatment did not help her symptoms. *Id.* at 47. Again, Kinnari does not argue that the ALJ erred in failing to discuss her testimony about her mental health treatment insurance problems or lack of success before drawing a negative inference. Nevertheless, even if she had raised this issue, "an ALJ's credibility assessment will stand 'as long as there is some support in the record.'" *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)); *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) ("But the standard of review employed for credibility determinations is extremely deferential, and the ALJ did provide some evidence supporting her determination."). The ALJ otherwise supported his subjective symptom determination with specific findings and substantial evidence. As discussed, the ALJ cited medical evidence, overall conservative course of treatment, and daily activities as all generally undermining the full extent of Kinnari's complaints. *See Berger*, 516 F.3d at 546. (affirming denial of benefits where the ALJ questioned the claimant's allegation of disabling pain because of his failure to pursue treatment options even though it could be "explained by his lack of insurance or money" since there was other support for the credibility determination). The ALJ's credibility determination was not patently wrong, despite the ALJ's failure to discuss other reasons for Kinnari's failure to continue to pursue mental health treatment.

Lastly, the ALJ reasonably considered Kinnari's statements about her daily activities and concluded that her "activities of daily living fail to suggest limitations greater than those included in the" RFC. (R. 25). *Jeske v. Saul*, 2020 WL 1608847, at *8 (7th Cir. Apr. 2, 2020) ("agency regulations instruct that, in an assessment of a claimant's symptoms, the evidence considered includes descriptions of daily-living activities."). The ALJ's conclusions in this regard are supported by substantial evidence. Kinnari lived with her husband, who worked outside the home, and her two children ages 13 and 6 at the time of the hearing. (R. 19). Kinnari could prepare simple meals like sandwiches or frozen dinners, go out to eat once or twice a month, do laundry and some cleaning, drive, drop off and pick up her children at school, attend their school and extracurricular events, attend medical appointments independently, grocery shop, and pay bills and handle money. *Id.* at 19, 23, 25, 405.

Kinnari does not challenge the accuracy of the ALJ's characterization of her activities of daily living but rather contends that the ALJ failed to recognize the "critical differences between activities of daily living and activities in a full-time job." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). "An ALJ may not equate activities of daily living with those of a full-time job," "[b]ut an ALJ is not forbidden from considering statements about a claimant's daily life." *Jeske*, 2020 WL 1608847, at *8. Here, the ALJ did not reason that Kinnari's daily activities demonstrate an ability to perform full-time work. Rather, the ALJ stated that those activities of daily living "fail to suggest limitations greater than those included in the above residual functional capacity." (R. 25). The ALJ reasonably concluded that Kinnari's daily activities along with the medical evidence, conservative course of treatment, and evidence as a whole, including credited medical

opinions, were inconsistent with her complaints of disabling symptoms and limitations. *See Gebauer*, 22020 WL 261231, at *4 (holding that in evaluating the severity of fibromyalgia, the ALJ appropriately considered the claimant's "daily activities in balance with the rest of her record, including that her doctors noted 'no apparent physical distress,' even on the days when she complained of pain," and a lack of evidence of objective findings or other symptoms associated with pain that would prevent sedentary work).  The Court therefore finds that the ALJ's subjective symptom determination is not patently wrong, is supported by substantial evidence, and is sufficiently detailed that the Court can trace the path of the ALJ's reasoning.

### CONCLUSION

For these reasons, Kinnari's motion for summary judgment [14] is denied, the Commissioner's motion for summary judgment [20] is granted, and the decision of the ALJ is affirmed.

**SO ORDERED.**

Dated:  April 14, 2020
_____
Sunil R. Harjani
United States Magistrate Judge